[Cite as *State v. Morlock*, 2024-Ohio-429.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Patricia A. Delaney, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2023 CA 00024 |
| JEREMY ALAN MORLOCK | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:     Appeal from the Stark County Court of
                             Common Pleas, Case No. 2022 CR 1020C

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      February 7, 2024

APPEARANCES:

For Plaintiff-Appellee                   For Defendant-Appellant

KYLE STONE                               KELLY S. MURRY
Stark County Prosecutor                  600 Courtyard Centre
BY: CHRISTOPHER A. PIEKARSKI             116 Cleveland Ave., N.W.
Assistant Prosecutor                     Canton, OH  44702
110 Central Plaza South
Canton, OH 44702

[Cite as *State v. Morlock*, 2024-Ohio-429.]

*Gwin, P.J.*

{¶1} Defendant-appellant Jeremy Alan Morlock [Morlock] appeals his convictions and sentences after a jury trial in the Stark County Court of Common Pleas, Stark County, Ohio.

*Facts and Procedural History*

{¶2} On July 14, 2022, the Stark County Grand Jury indicted Morlock on: Aggravated Murder, [Joseph Pomeroy] an unclassified felony, in violation of R.C. 2903.01(A), 2929.02(A)[1]; Murder, [Joseph Pomeroy] an unclassified felony, in violation of R.C. 2903.02(A)(D), 2929.02(B)[2]; Kidnapping [Buddy Myers], a felony of the first degree, in violation of R.C. 2905.01(A)(2)(C)(1)[3]; Aggravated Robbery [Buddy Myers], a felony of the first degree, in violation of R.C. 2911.01(A)(1)(C)[4]; Grand Theft of a Motor Vehicle [Buddy Myers], a felony of the fourth degree, in violation of R.C. 2913.02(A)(1)(B)(5)[5]; Kidnapping [to terrorize, or to inflict serious physical harm on the victim], [Blake Waldrup], a felony of the first degree, in violation of R.C. 2905.01(A)(3)(C)(1)[6]; Kidnapping [to engage in sexual activity], [Blake Waldrup], a felony of the first degree, in violation of R.C. 2905.01(A)(4)(C)(1)[7]; Felonious Assault [Blake Waldrup], a felony of the second degree, in violation of R.C. 2903.11(A)(1)(D)(1)(a)[8]; Rape [Blake Waldrup], a felony of the first

---

[1] Morlock was also charged with aiding and abetting Clayton Justin Smart, Mary Ann Soliday, and/or Andrew Charles Williams in the commission of this offense.
[2] See Note 1
[3] Morlock was also charged with aiding and abetting Clayton Justin Smart, Mary Ann Soliday, and/or Bonnie June Metz in the commission of this offense.
[4] See Note 3
[5] See Note 3
[6] See Note 3
[7] See Note 3
[8] Morlock was also charged with aiding and abetting Clayton Justin Smart and Mary Ann Soliday, in the commission of this offense.

degree, in violation of R.C. 2907.02(A)(2)(B)[9]; Gross Abuse of a Corpse, a felony of the fifth degree, in violation of R.C. 2927.01(B)/(C)[10]; and Tampering with Evidence, a felony of the third degree, in violation of R.C. 2921.12(A)(1)(2)(B).[11]

{¶3}     At trial, Clayton Smart [Clayton], Morlock's co-defendant, testified on behalf of the state in exchange for a reduced sentence of 30 to 35 years for pleading to involuntary manslaughter, three counts of kidnapping, aggravated robbery, grand theft of a motor vehicle, felonious assault, gross abuse of a corpse, and tampering with evidence. 3T. at 64-65[12]. Andrew Williams [Andrew], also a co-defendant, testified on behalf of the state as part of a plea negotiation wherein he would receive a sentence of 12 to 15 years for pleading to involuntary manslaughter, tampering with evidence, and gross abuse of a corpse. 2T. at 156-157. Jordan McWeeny [Jordan], a co-defendant of Morlock's testified on behalf of the state as part of a plea bargain wherein the state will drop the charge for tampering with evidence and recommend one year of probation for pleading to gross abuse of a corpse. 2T. at 97-98.

*The Kidnapping and Aggravated Robbery of Buddy Myers, and the Grand Theft*

*of His Car*

{¶4}     In May, 2022, Morlock lived in a small house on Correll Avenue Northeast, in Canton, Ohio, along with his girlfriend Bonnie Metz [Bonnie], Clayton, and Clayton's girlfriend Mary Soliday [Mary]. 1T. at 239-240, 248, 327; 2T. at 60-61; 3T. at 66, 68.

---

[9] See Note 8
[10] See Note 1
[11] See Note 1
[12] For clarity, the transcript of Morlock's jury trial will be referred to as "__T.__" signifying the volume and page number.

{¶5} On May 5, 2022, Morlock and Bonnie argued over her allegations that her ex-boyfriend and father of her children, Buddy Myers [Buddy], had raped her one time while Morlock was away. 3T. at 68. Clayton testified that, in response to these allegations, the group devised a plan to lure Buddy to the house, so they could "talk about it and then go from there." 3T. at 68. Clayton claimed the phrase "go from there" meant Morlock wanted to kill Buddy, which was the "ultimate plan[.]" 3T. at 68-69, 76, 117.

{¶6} Mary texted Buddy that she wanted to have sex with him and asked him to come to the Correll house. 1T. at 247-248; 3T. at 69. Buddy came to the house and followed Mary inside, while Morlock, Clayton, and Bonnie all lied in wait in Morlock's bedroom. 1T. at 249-250, 265; 3T. at 69-70, 105-106. Buddy soon noticed some shadows in the back hallway and tried to leave the house, only to be confronted by Clayton, who was now standing in front of the doorway and holding a gun to Buddy's head. 1T. at 253-255, 258, 265-266; 3T. at 69, 71, 106. Clayton told Buddy to sit on the nearby futon and to give him everything he had on him, so Buddy surrendered his cell phone, wallet, and car keys. 1T. at 254; 3T. at 71-72, 106. Morlock, Mary, and Bonnie all entered the room while Buddy was on the futon. 1T. at 255-256; 3T. at 71. Morlock asked Buddy if he could use his car to go to the store, though neither Buddy nor Clayton believed Buddy really had a choice in the matter, as he was being held at gunpoint. 1T. at 256-257; 3T. at 72-73. Morlock took Buddy's car keys and drove his car to the Circle K. 1T. at 256-257; 3T. at 72. When Morlock returned, Clayton gave the gun to Mary and told her to shoot Buddy if he moved. 1T. at 256-258; 3T. at 73-74, 106. Clayton searched Buddy's car, found a pair of silver handcuffs, and then used them the handcuff Buddy to a metal dog leash that Mary had tied around the futon. 1T. at 258-260, 266; 3T. at 73-75, 106.

{¶7}    While holding the now-restrained Buddy at gunpoint, Morlock and Clayton both interrogated him about the rape allegations for perhaps ten to fifteen minutes, though Buddy recalled it lasting for what seemed like forever. 1T. at 257, 267. They kept repeating the same questions, and Buddy feared for his life and just wanted to leave. 1T. at 257, 260.

{¶8}    Clayton and Mary took Buddy's cell phone, wallet, and car keys, and drove his car to a local restaurant, where they stole the stereo system out of it and abandoned the vehicle. 1T. at 260; 3T. at 75. Clayton later sold the stereo system. 3T. at 76. He testified that once he and Mary left with the car, Morlock was supposed to kill Buddy. 3T. at 118.

{¶9}    After Clayton and Mary left, Buddy asked Morlock if he could leave. 1T. at 261. Morlock said he could not hold Buddy against his will. 1T. at 261, 267. Buddy then broke the chain on his own, escaped, and ran to his grandma's house to call the police and then took police back to where he was held. 1T. at 261-262.

{¶10}   At approximately 1:48 A.M. on May 5, 2022, Canton Police Officers were dispatched to a residence located on Alexander Place Northeast in Canton, Ohio in response to a report called in by OnStar Navigation Services for a stolen vehicle, and an individual being handcuffed and held against his will. 1T. at 236-237. As Officer Brandon Shackle and his partner Officer David Grant arrived at the residence, they located the victim, Buddy Myers, exiting the home. 1T. at 237. Officer Shackle noted that Buddy had a silver handcuff on his left wrist. Id. Buddy told the officers that Morlock, Clayton, Mary, and Bonnie were all responsible for the incident. 1T. at 242-243. Following Buddy's directions, Officer Shackle and Officer Grant drove to the residence located at 616 Correll

Avenue Northeast, Canton, Ohio. 1T. at 239-240. Officer Shackle testified that no one answered the door when he knocked, no lights were on in the residence, no movement was heard inside, and Buddy's vehicle was not parked anywhere in the immediate area of the residence. 1T. at 240.

*The murder of Joseph Pomeroy*

{¶11}  Pomeroy moved in to live with the others at the Correll house on the 6th or 7th of May, 2022. 3T. at 80. According to Clayton, problems soon occurred as "things came up missing." 3T. at 80. Clayton's drugs and money, Morlock's tablet, Andrew's cell phone, and some other items all disappeared from the house, and they believed Pomeroy stole them. 3T. at 80, 107-108, 118. Clayton and Morlock were both angry and upset that their property was missing. 3T. at 81, 108, 118.

{¶12}  Clayton testified that on May 8, 2022, he, Morlock, Mary, and Andrew all went to an abandoned house where they believed they would find Pomeroy. 3T. at 80-81, 109. The group then dragged Pomeroy into the basement of a nearby apartment, inhabited by a man named Rob. 2T. at 160, 170-171; 3T. at 81-83, 87-88. Andrew testified that he did not join the group until they had Pomeroy in the basement of the apartment located at Ninth and McKinley in Canton, Ohio. 2T. at 160-161. Clayton testified that everybody agreed to kill Pomeroy. 3T. at 82.

{¶13}  Clayton testified they all started beating up Pomeroy with their fists at first, but then Morlock hit Pomeroy with a brick. 3T. at 83-84. Clayton and Mary also hit Pomeroy with a brick. Id. Mary also kicked Pomeroy and struck him with a machete on his fingers and back. 3T. at 84, 92. Clayton testified that Pomeroy died in that basement, and that he was dead before Morlock left. 3T. at 85, 110.

{¶14} Andrew testified that Clayton called him that day because he had an emergency and needed Andrew to come to the apartment at Ninth Street and McKinley. 2T. at 159-161, 176. Andrew went into the basement, where he saw Morlock, Clayton, Mary, and Rob, as well as Pomeroy on a tarp on the floor. 2T. at 161-163, 166, 176. Pomeroy was bleeding from his head and had obviously been beaten up, but was sitting up and was still moving. 2T. at 163, 165-166, 176. Andrew then joined Morlock, Clayton, Mary, and an individual named "Rob" in continuing to assault Pomeroy. 2T. at 163-164, 166, 177. Andrew recalled specifically seeing Morlock striking Pomeroy. 2T. at 174-175, 181. He also saw Mary holding a machete, but was unsure if she ever used it in his presence, though he later observed a laceration on Pomeroy's back. 2T. at 164, 177.

{¶15} At one point, Andrew struck Pomeroy in the ribs and then went upstairs to smoke methamphetamine with a few others who were already up there. 2T. at 164-166. Morlock remained in the basement when Andrew went upstairs, but he too went upstairs and left at some point. 2T. at 165-166, 177, 180. Shortly after Morlock left, Rob came upstairs to smoke methamphetamine with Andrew. 2T. at 166. Andrew testified that Morlock came upstairs when Andrew was upstairs smoking meth. 2T. at 177. When Andrew returned to the basement, Pomeroy was no longer moving and did not appear to be breathing, so Andrew believed he was either unconscious or likely already dead. 2T. at 166.

{¶16} Clayton, Andrew, and Mary all wrapped up Pomeroy's body in a blanket and tarp, and secured it with a chain, an HDMI cord, a USB cord, some rope, bungee cords, and duct tape. 1T. at 314-315, 318-320; 2T. at 166-167, 171, 178; 3T. at 85-86, 88-89, 110. They cleaned all the blood in the basement with a mop, bleach, dish soap, and water.

2T. at 166-167, 178-179; 3T. at 87. They put the cleaning materials into a black trash bag, along with the brick, broken pieces from the brick, some gloves, and Clayton's blood-covered shoes. 2T. at 167; 3T. at 86-87, 91.

{¶17}   After wrapping the body and cleaning the basement, Andrew called Jordan for a ride. 2T. at 99-100, 114, 167, 179; 3T. at 89. Jordan testified that he received a "weird" phone call from Andrew asking for a ride, in which Andrew said, "Once was beating, now is not; I need a ride." 2T. at 100-101. Because he considered Andrew to be "family," Jordan agreed to meet Andrew at his "uncle's house" at Ninth and McKinley. 2T. at 101-103, 114.

{¶18}   Jordan arrived in his white Chevy HHR, and parked on the side of the building. 2T. at 103-105, 168; 3T. at 90. Clayton, Andrew, and Mary all brought Pomeroy's body up the stairs and outside. 2T. at 168, 170; 3T. at 91. Clayton approached Jordan and said, "No matter what happens don't get out of the car or I'll kill your wife and your daughter." 2T. at 104, 114. Clayton then told Andrew that if he had any doubts about Jordan's ability to help get rid of the body he would just "end him" right there. 2T. at 169. Clayton said, "If you don't think he can do it, I'll just do it myself." 2T. at 179-180. Andrew replied, "No, don't do that. I'll be here with him." 2T. at 169. Clayton and Andrew placed Pomeroy's body in the back seat, along with the black trash bag. 2T. at 105-107, 168; 3T. at 91. Morlock returned to the scene around this time. 3T. at 89.

{¶19}   Andrew got into the HHR and told Jordan to drive to his grandma's pig farm in Louisville, Ohio. 2T. at 107. Jordan refused, however, and they instead first drove to Andrew's cousin's house at 17th and St. Elmo, where they stayed for about ten minutes. 2T. at 107-108, 116-118. They then drove to a sand and gravel pit to dispose of the body,

but too many people were there, so Andrew told Jordan to keep driving. 2T. at 108-109, 117-118. While traveling just past the intersection of 12th and Hardington, Andrew told Jordan to stop the vehicle. 2T. at 110-111, 118. Andrew jumped out of the vehicle, removed Pomeroy's body from the car, and dumped it off the side of the road. 2T. at 111, 172-173. They drove away, and Andrew later discarded the trash bag. 2T. at 112, 174.

{¶20} On the evening of May 10, 2022, Deputy D'Metre House of the Stark County Sheriff's Office was dispatched to Hardington Avenue after two citizens reported finding a body wrapped up in a ditch on the side of the road. 1T. at 269-274. Detective Derek Little of the Stark County Sheriff's Office also responded to the scene. 1T. at 311-313. At some point, Detective Little recognized Pomeroy and positively identified his body. 1T. at 31-32.

*The Kidnapping, Felonious Assault, and Rape of Blake Waldrup*

{¶21} Mary's ex-boyfriend Blake Waldrup [Blake] used to live with her and several others in an apartment on Ninth Street. 1T. at 281-283, 303; 3T. at 93. Clayton moved in with them at some point and he began "seeing" Mary. 1T. at 283-284, 304; 3T. at 67. Mary told Clayton that Blake used to beat her and was very abusive, which upset Clayton. 3T. at 93. Blake and Clayton got into an argument and fist fight one day and, after Blake threw Clayton onto the ground and "embarrassed" him, Clayton retreated to the kitchen to retrieve a knife. 1T. at 284-285, 304; 3T. at 67-68, 111. Blake ran out the door and left his belongings behind, effectively moving out of the apartment for good. 1T. at 284-286; 3T. at 67-68, 111.

{¶22} According to Clayton, he devised a plan sometime later with both Mary and Morlock to lure Blake to the Correll house. 3T. at 93. Mary's birthday is May 10th, and

Clayton testified that Mary wanted to get Blake over to the Correll house as a "birthday present." 2T. at 24; 3T. at 100. On the evening of May 9th, Mary told Blake that she wanted to be with him and asked him to come to the Correll house; Mary and a mutual friend named Noah (aka "Country") met up with Blake in a park prior to heading to the house. 1T. at 286-287, 304-305; 3T. at 93-94, 111. When Blake eventually arrived and entered the house, Clayton held him at gunpoint. 3T. at 95. Clayton pistol-whipped Blake repeatedly, and then Clayton, Mary, and a man named Kris all took Blake down into the basement and continued beating him; Morlock soon joined them and participated in the beatings. 1T. at 288-289; 3T. at 94-95, 112, 118-119. Waldrup testified the individuals in the house were Mary, Clayton, and Morlock. 1T. at 289.

{¶23} Blake testified he was then taken to the basement of the house where he was beaten with a tire iron, machete and a ratchet with a socket attached. 1T. at 289-290; 3T. at 96. Blake further testified that while he was in the basement his hands were tied behind his back, then he was tied to the ceiling and beaten with a tire iron. 1T. at 290-291. Blake testified that while he was in the basement he saw Morlock only twice and that Morlock put a sex toy in Blake's rectum. 1T. at 291; 3T. at 98. Morlock also shot Blake with some type of gel blaster BB gun. 3T. at 119, 122.

{¶24} Blake testified that Mary and Clayton had sex in front of him and that Clayton would use a big torch to burn Blake so he could stop his wounds from bleeding. 1T. at 292, 294. Waldrup also stated that Clayton tried to cut his right ear off with the machete. Id. at 293.

{¶25} At one point, Blake managed to untie himself, which angered both Clayton and Morlock, so they "beat [him] to hell" and tied him up again. 1T. at 300-301; 3T. at 97-

This time, they tied his arms behind his back, tied his feet together, and hung him in the air from the rafters, face down. 1T. at 290; 3T. at 98. Mary wrote a note on a sheet of paper and taped it up in the basement room where Blake was being held captive. 3T. at 97. The note read: "What did Mary ever do to deserve everything you did to her?" 2T. at 198; 3T. at 97; State's Exhibit 18.

{¶26} Blake spent two to three months in the hospital afterward and endured many surgeries. 1T. at 301. He was not able to speak or walk, so he required rehab, physical therapy, and verbal therapy. 1T. at 302. At the time of trial, Blake still had scars on his ankles and could not feel his feet. 1T. at 293, 295. Blake admitted that he was "in and out" of consciousness throughout the ordeal due to his injuries, but he specifically recalled seeing Morlock at least "twice" or "a few times"; he remembered Morlock beating and hurting him more than once, hitting him with the dildo, inserting the dildo into his rectum, and helping to tie him up and hang him from the rafters. 1T. at 291, 296-297, 306-308.

{¶27} During Detective Little's interview of Morlock on May 13, 2023, Morlock stated he doesn't go in the basement and didn't know anything about anyone being in the basement because he's not home much. 1T. at 335-336.

*The police investigations*

{¶28} Dr. Alison Krywanczyk, the Deputy Medical Examiner at the Cuyahoga County Medical Examiner's Office, performed the autopsy on Pomeroy's body and testified as an expert at trial. 2T. at 122-128, 147. Dr. Krywanczyk testified that the cause of Pomeroy's death was blunt and sharp force injuries. 2T. at 147. Based on the autopsy report, the Stark County Coroner determined Pomeroy's death to be a homicide. 2T. at 130-131, 148.

{¶29} While investigating Pomeroy's death, Detective Little spoke to Pomeroy's probation officer and learned about a recent phone call from Buddy, who said he had been robbed by Morlock, Clayton, and Mary, and that they stole his car. 1T. at 325-326, 347-348. Pomeroy's ex-girlfriend [Chastity] permitted the police to search through her cell phone because Pomeroy often used it to communicate with people. 1T. at 326-327. The police found a text message on her phone referencing a huge fight amongst several people, in which Morlock was mentioned by name. 1T. at 327. Detective Little also read a Canton police report and learned that Morlock lived at the Correll house with his girlfriend, Bonnie, who was currently in jail. 1T. at 327-328. The police then listened to jail calls between Morlock and Bonnie. 1T. at 328-332. In one call, they learned that Morlock kicked Pomeroy out of the Correll house on either May 7th or 8th. 1T. at 329; State's Exhibit 45. In another call, Morlock said that he kicked Pomeroy out because he stole from them, and that Pomeroy "got beat up real good" and "got fucked up pretty good." 1T. at 330-331.

{¶30} Taylor Loy works for the Adult Parole Authority and was Morlock's parole officer at the time. 2T. at 58-60. She received a phone call regarding an alleged kidnapping and robbery of Buddy that occurred at Morlock's house on Correll, which she confirmed with the police report. 2T. at 61. In response, she coordinated a May 13th home visit and search of the Correll house with multiple agencies. 2T. at 60. Lucas Shanklin of the Jackson Police Department and Stark County Sheriff's Office was one of the officers assisting Loy that day. 2T. at 30-31. He testified that, due to the robbery complaint against Morlock, there was a concern that firearms were in the house. 2T. at 31-32. Officer John

Korchnak of the Canton Police Department also assisted that day and initially helped to set up a perimeter around the house. 2T. at 45-48.

{¶31} The police and parole officers first made contact only with Mary at the Correll house. 2T. at 34, 63. Mary came outside and said Morlock was not there, but also said they were welcome to come inside and look for him. 2T. at 63-64. Mary talked in circles, did not make much sense, and repeatedly denied that anyone else was in the house; but she ultimately admitted that her boyfriend, Clayton, was upstairs. 2T. at 34, 64. Clayton was soon found hiding in an upstairs closet with a loaded gun, but officers were able to drag him out of the closet by his feet and arrest him. 1T. at 347; 2T. at 36-38, 43-44, 66; 3T. at 101, 114-115.

{¶32} While conducting a protective sweep of the house for anyone else who might be hiding, Officer Korchnak asked Loy if the basement had been cleared yet, and she said no. 2T. at 49. The officers observed that the door to the basement had a silver, metal slide lock on it. 2T. at 50, 66- 67, 70-71. They unlocked the door and proceeded down into the dark, "deplorable" basement, which had no windows and very dim lighting. 2T. at 50-52, 66-67, 196. Loy was wearing her body cam at the time, and the body cam footage was entered into evidence. 2T. at 69-71; State's Exhibit 32. The officers soon came across a wooden door in the basement that was not on any hinges, but was simply propped up or jammed in front of an opening into a small, cellar room. 2T. at 51-53, 67, 196-197. Inside that room, Officer Korchnak was the first to observe what he thought was a deceased male lying on the floor, covered by a blanket, and not moving; he promptly notified the others. 2T. at 40, 53-54, 56, 68. Just then, Blake, the body lying on the floor, gasped for air and woke up, though he could not speak clearly or coherently. 2T. at 54,

68-69. As they tried standing Blake upright, he jerked back with his left hand and removed a dildo from his rectum. 2T. at 55-56, 69. Blake was ushered outside and, although the officers struggled to understand him, Officer Korchnak recalled hearing Blake mumbling the phrase, "They wouldn't let me go." 2T. at 56, 71. They eventually identified Blake and transported him to the hospital. 2T. at 57, 69. They informed the officers investigating Pomeroy's death that another victim with similar injuries had been found. 1T. at 332.

{¶33} The officers sought and obtained a search warrant for the house. 1T. at 333, 347; 2T. at 57. While awaiting the warrant, Mary informed the police that Morlock could be found near Ninth and McKinley. 2T. at 42, 72. Officers went to that area and, after a brief foot pursuit, they cornered Morlock in an apartment building and he surrendered. 2T. at 43, 72-74, 77-81.

{¶34} Detective Little and Detective Mark Diels of the Canton Police Department interviewed Morlock on May 13th and May 16th. 1T. at 334-337; 2T. at 89-90. Detective Little testified that Morlock told him that the last time he had seen Pomeroy was approximately two months prior. 1T. at 335.

{¶35} Detective Little testified that he again spoke to Morlock on May 16, 2023. Morlock told the detective that Pomeroy had been staying at his house for five days but that he had to kick him out because Pomeroy stole from him. 1T. at 336-337.

{¶36} Detective Little testified Morlock then said he last saw Pomeroy in the basement at a house on Ninth and McKinley. 1T. at 337. Detective Little also testified that Morlock told him Mary, Clayton, and Andrew were also present in the basement with Pomeroy and that they were beating Pomeroy up pretty good, hitting him, and kicking him all over his body. 1T. at 337-338.

{¶37} Detective Little testified a search warrant was obtained for the home on Ninth and McKinley and that during the search a box of gloves and a partially used roll of duct tape were found on a coffee table in the basement. 1T. at 341-342. Upon cross examination, Detective Little testified that Morlock denied having anything to do with Pomeroy. 1T. at 345-346.

{¶38} Andrew's name came up during the interviews, and the police learned that a vehicle was involved. 1T. at 338. During an interview with Andrew, he told police exactly where they could find the Chevy HHR that was involved. 1T. at 339, 348. Police searched the HHR on May 25th and found some cords on the back floorboard that matched the cords found wrapped around the tarp and Pomeroy's body. 1T. at 339-340.

{¶39} On January 1, 2023, Detective Diels received information that more evidence was possibly still inside the Correll house. 2T. at 85. Detective Diels learned that the machete and hatchet were possibly concealed inside of a basement wall, so he returned to the house and retrieved the evidence. 2T. at 86-88, 91-93.

*The jury's decision*

{¶40} The jury ultimately found Morlock guilty of murder (count 2), kidnapping (count 3), aggravated robbery (count 4), grand theft of a motor vehicle (count 5), kidnapping [to terrorize, or to inflict serious physical harm on the victim] [Blake Waldrup], (count 6), felonious assault (count 8), and rape (count 9). They found him not guilty of aggravated murder (count 1), kidnapping [to engage in sexual activity] [Blake Waldrup] (count 7), gross abuse of a corpse (count 10), and tampering with evidence (count 11).

*Morlock's Sentence*

{¶41} On January 24, 2023, the trial judge sentenced Morlock to an aggregate prison term of forty-three years to life, and ordered him to pay $5,417.00 in restitution. On April 6, 2023, the court re-sentenced Morlock to the same sentence, but also classified him as a Tier III sex offender and properly notified him of his registration requirements.

*Assignments of Error*

{¶42} Morlock raises four Assignments of Error,

{¶43} "I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN CONVICTIONS AGAINST APPELLANT THEREFORE THE CONVICTIONS MUST BE REVERSED.

{¶44} "II. THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED, AND MUST BE REVERSED.

{¶45} "III. THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶46} "IV. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ORDERED $5,417 IN RESTITUTION TO BUDDY MYERS WITHOUT HOLDING A RESTITUTION HEARING TO PROVIDE PROOF OF ECONOMIC LOSS BY A PREPONDERANCE OF THE EVIDENCE AS REQUIRED BY STATUTE."

I.

{¶47} In his First Assignment of Error, Morlock argues that his convictions for murder [Pomeroy] (count 2), kidnapping [Buddy Myers] (count 3), aggravated robbery

[Buddy Myers] (count 4), and grand theft [Buddy Myers] (count 5) are not supported by sufficient evidence.

**Standard of Appellate Review**

**{¶48}** The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013); *Hurst v. Florida*, 577 U.S. 92, 136 S.Ct. 616, 621, 193 L.Ed.2d 504 (2016). The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court. *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶30; *State v. Jordan,* Slip Op. No. 2023-Ohio-3800, ¶13. "This naturally entails a review of the elements of the charged offense and a review of the state's evidence." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶13.

**{¶49}** When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997)*; *Walker*, 150 Ohio St.3d at ¶30. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. *State v. Poutney*, 153 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not

second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001), *quoting Jenks* at paragraph two of the syllabus; *Walker* 150 Ohio St.3d at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997); *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶74.

**Issue for Appellate Review**: *Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, if believed, would convince the average mind that Morlock was guilty beyond a reasonable doubt of the murder of Pomeroy*

**{¶50}** Morlock was convicted of murder in violation of R.C. 2903.02(A), which states, "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy." The cause of Pomeroy's death was blunt and sharp force injuries. 2T. at 147. Based on the autopsy report, the medical examiner concluded Pomeroy's death was a homicide. 2T. at 130-131, 148.

**{¶51}** R.C. 2901.22 Culpable mental states, provides:

(A). A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

**{¶52}** Morlock was also charged with aiding and abetting Clayton Justin Smart, Mary Ann Soliday, and/or Andrew Charles Williams in the commission of this offense. R.C. 2923.03(A)(2) Complicity provides, in relevant part,

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

\*\*\*

(2) Aid or abet another in committing the offense;

**{¶53}** Anyone complicit in the commission of an offense by aiding and abetting the principal offender "shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(A)(2)/(F). The instructions given the jury in the case at bar properly permitted the jury to find Morlock guilty of murder based on a finding that he aided and abetted his codefendants in the commission of murder, and therefore was complicit in the commission of the murder.

**{¶54}** It is true that a person's mere association with a principle offender is not enough to sustain a conviction based on aiding and abetting. *State v. Sims*, 10 Ohio App.3d 56, 58, 460 N.E.2d 672, 674-675 (8th Dist. 1983); *State v. Paskins,* 5th Dist. Fairfield No. 2021 CA 00033, 2022-Ohio-4024, ¶26. With respect to the requirements for a conviction for aiding and abetting, the Supreme Court of Ohio has stated,

To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the

criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, at syllabus.

**{¶55}** Aiding and abetting may be shown by both direct and circumstantial evidence and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. *Paskins,* ¶27, *citing State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68, (8th Dist. 1981), *citing State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist. 1971); *See also, State v. Mendoza*, 137 Ohio App.3d 336, 342, 738 N.E.2d 822 (3rd Dist. 2000), *quoting State v. Stepp*, 117 Ohio App.3d 561, 568–569, 690 N.E.2d 1342 (4th Dist. 1997).

**{¶56}** Aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout. *Paskins,* ¶28, *citing State v. Cartellone*, 3 Ohio App.3d at 150, 444 N.E.2d 68. *See also, State v. Trocodaro*, 36 Ohio App.2d 1, 301 N.E.2d 898 (10th Dist. 1973); State *v. Lett*, 160 Ohio App.3d 46, 52, 2005-Ohio-1308, 825 N.E.2d 1158, 1163 (8th Dist.); *State v. Polite*, 5th Dist. Stark No. 2017 CA 00129, 2018-Ohio-1372, 2018 WL 1747931, ¶56.

**{¶57}** "The court must view the evidence in the light most favorable to the prosecution and defer to the trier of fact on questions of credibility and the weight assigned to the evidence. *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 146." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132; *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶29.

**{¶58}** Morlock's sole argument on appeal centers upon his contention that the state failed to present sufficient evidence that he purposely caused the death of Pomeroy.

[Appellant's brief at 16]. He further argues that "no testimony" was presented to establish that he acted with purpose to kill Pomeroy. [Id.]

{¶59} Contrary to Morlock's arguments, sufficient evidence was presented to prove beyond a reasonable doubt that Morlock aided and abetted his co-defendants in the murder of Pomeroy.

{¶60} Evidence was presented that Morlock, Clayton and Andrew were angry at Pomeroy because they believed he had stolen property belonging to them while living at the Correll house. Evidence was presented that Clayton, Morlock, Mary, and Andrew all went to an abandoned house where they believed they would find Pomeroy. 3T. at 80-81, 109. The group then dragged Pomeroy into the basement of a nearby apartment, inhabited by a man named Rob. 2T. at 160, 170-171; 3T. at 81-83, 87-88. Clayton testified that everybody agreed to kill Pomeroy. 3T. at 82.

{¶61} Clayton testified they all started beating up Pomeroy with their fists at first, but then Morlock hit Pomeroy with a brick. 3T. at 83-84. Clayton and Mary also hit Pomeroy with a brick. Id. Mary also kicked Pomeroy and struck him with a machete on his fingers and back. 3T. at 84, 92. Clayton testified that Pomeroy died in that basement, and that he was dead before Morlock left. 3T. at 85, 110.

{¶62} Even if Morlock had left the basement before Pomeroy was dead, the evidence establishes that he was present and participated in the beating of Pomeroy with the others. Morlock not only witnessed the others throwing bricks at Pomeroy, he himself hurled them at Pomeroy.

{¶63} The trier of fact may infer an intention to kill from the surrounding circumstances where the natural and probable consequence of a defendant's actions is

to produce death. *State v. Robinson*, 161 Ohio St. 213, 118 N.E.2d 517(1954), paragraph five of the syllabus. The testimony of the medical examiner established that Pomeroy had several skull fractures. Thus, the natural and probable consequences of three people hurling bricks at a defenseless person's head is to produce death. It matters not whether Morlock was actually in the room when Pomeroy died as the result of the severe beatings inflicted by each one of the participants. Morlock was not an innocent bystander who merely happened along; he was a willing participant.

> Where only such unlawful act was contemplated in the original conspiracy, although not identical with or similar to the criminal act charged, if the conspired unlawful act and the manner of its performance would be reasonably likely to produce death, each conspirator is equally guilty with the principal offender, as an aider and abettor in the homicide, although such aider and abettor was neither present nor had knowledge of the physical killing or of the weapon used.

*State v. Doty*, 94 Ohio St. 258, 113 N.E. 811(1916), syllabus at para. 2. *See also,* State *v. Black*, 103 Ohio St. 434, 441, 133 N.E. 795, 797(1921); *State v. Hickman,* 5th Dist. Stark No. 2003-CA-00408, 2004-Ohio-6760, ¶62,

**{¶64}** Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Morlock did at the very least aid and abet another in the commission of murder. We hold, therefore, there was sufficient evidence to support Morlock's conviction for the offense of Murder.

**Issue for Appellate Review**:  *Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, if believed, would convince the average mind that Morlock was guilty beyond a reasonable doubt of the kidnapping, aggravated robbery, and grand theft with respect to Buddy Myers.*

**{¶65}**  Morlock next contends that the state did not present sufficient evidence to prove beyond a reasonable doubt that Morlock aided or abetted in the commission of Kidnapping, Aggravated Robbery, or Grand Theft with respect to Buddy Myers.

**{¶66}**  Morlock was charged with kidnaping in violation of R.C. 2905.01(A)(2),

(A) No person, by force, threat, or deception, ... by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter;

**{¶67}**  Morlock was further convicted of aggravated robbery in violation of R.C. 2911.01(A)(1) provides,

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

**{¶68}**  Finally, with respect to Buddy, Morland was convicted of Grand theft of a Motor Vehicle in violation of R.C. 2913.02(A)(1) provides,

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

{¶69} Morlock was also charged with aiding and abetting Clayton, Mary, and/or Bonnie June Metz in the commission of these offenses.

{¶70} Evidence was presented that Morlock and Bonnie argued over her allegations that her ex-boyfriend and father of her children, Buddy had raped her one time while Morlock was away. 3T. at 68. Morlock, Clayton, Mary and Bonnie devised a plan to deceive Buddy into believing Mary wanted to have sex with him in order to lure Buddy to the home to exact revenge. Buddy fell for the deception, came to the house and followed Mary inside, while Morlock, Clayton, and Bonnie all lied in wait in Morlock's bedroom.

{¶71} Clayton held a gun to Buddy's head and told him to give him everything he had on him. Buddy surrendered his cell phone, wallet, and car keys. Mary and Morlock were present when these events transpired. While holding Buddy at gunpoint, Morlock and Clayton both interrogated him about the rape allegations for perhaps ten to fifteen minutes. Evidence was presented that Buddy feared for his life and just wanted to leave.

{¶72} Clayton and Mary took Buddy's cell phone, wallet, and car keys, and drove his car to a local restaurant, where they stole the stereo system out of it and abandoned the vehicle. 1T. at 260; 3T. at 75. Clayton later sold the stereo system. 3T. at 76. Buddy's car was never returned to him.

{¶73} The evidence presented was that Morlock willingly participated in the deception, detention and theft. Morlock was aware that Clayton had a gun that he used to threaten Buddy into compliance. Morlock concedes that his codefendants restrained Buddy's liberty and forcibly took his vehicle. Contrary to Morlock's assertions evidence was presented that he was in a bedroom with his codefendants in a plan to confront Buddy about the rape allegations, he questioned Buddy while Buddy was handcuffed to the futon and was being threatened with a gun. The entire reason Buddy was lured to the residence was Morlock was angry because Bonnie told him Buddy had raped her one time while Morlock was away.

{¶74} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Morlock did at the very least aid and abet another in the commission of kidnapping, aggravated robbery and grand theft of a motor vehicle. We hold, therefore, there was sufficient evidence to support Morlock's conviction for the offenses of kidnapping, aggravated robbery and grand theft of a motor vehicle.

{¶75} For the forgoing reasons, Morlock's First Assignment of Error is overruled.

II.

{¶76} In his Second Assignment of Error, Morlock argues his convictions are against the manifest weight of the evidence.

**Standard of Appellate Review – Manifest Weight**

{¶77} As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355*; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

{¶78} Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, *supra,* 78 Ohio St.3d at 386-387, 678 N.E.2d 541(1997), *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶83. When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *State v. Jordan*, Slip Op. No. 2023-Ohio-3800; *Thompkins* at 387, 678 N.E.2d 541, *citing Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652(1982) (quotation marks omitted); *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1244, ¶25, citing *Thompkins.*

{¶79} Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). The Ohio Supreme Court has emphasized: "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and

every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.'" *Eastley v. Volkman,* 132 Ohio St.3d 328, 334, 972 N.E.2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978).

**{¶80}** As one Court has explained,

When faced with a manifest weight of the evidence challenge, we must consider whether the state "carried its burden of persuasion" before the trial court. *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 26; *see State v. Martin*, Slip Opinion No. 2022-Ohio-4175, ¶ 26. Unlike the burden of production, which concerns a party's duty to introduce enough evidence on an issue, the burden of persuasion represents a party's duty to convince the factfinder to view the facts in his or her favor. *Messenger* at ¶ 17. Therefore, in order for us to conclude that the factfinder's adjudication of conflicting evidence ran counter to the manifest weight of the evidence— which we reserve for only the most exceptional circumstances—we must find that the factfinder disregarded or overlooked compelling evidence that weighed against conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387-388, 678 N.E.2d 541 (1997). We accordingly sit as a "thirteenth juror" in this respect. Id.

*State v. Gibson*, 1st Dist. Hamilton No. C-220283, 2023-Ohio-1640, ¶ 8.

**{¶81}** Further, to reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel

reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, *citing Thompkins* at paragraph four of the syllabus.

**Issue for Appellate Review**: *Whether the jury clearly lost their way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered*

**{¶82}** Morlock makes two arguments in support of his contention that the jury clearly lost their way and created a manifest miscarriage of justice by convicting him. First, Morlock contends that the testimony was contradictory between Clayton and Andrew. Specifically, Morlock challenges the testimony that Pomeroy was dead before Morlock left the basement.

**{¶83}** As we noted in our disposition of Morlock's First Assignment of Error, because he was also charged with aiding and abetting, it does not matter whether he was present at the time Pomeroy expired. Testimony was presented, and not refuted, that Morlock joined in when the codefendants were hurling bricks at the helpless victim. He was aware of the actions of his codefendants and noted his acceptance of their actions by joining in with their beating of Pomeroy. It matters not which one threw the brick that fractured Pomeroy's skull; rather, each individual is responsible for the death.

**{¶84}** Further, the jury was instructed,

You are not required to believe the testimony of any witness simply because the witness was under oath. You may believe or disbelieve all or any part of the testimony of any witness. It is your duty to decide what

testimony to believe and what testimony not to believe. The testimony of
one witness believed by you is sufficient to prove any disputed fact.

3T. at 160.

{¶85}  Morlock next challenges the fact that the police did not investigate other individuals.

{¶86}  "Nothing in the record indicates what kind of testimony [the witnesses] could have provided. Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal."  *State v. Madrigal*, 87 Ohio St.3d 378, 390–391, 721 N.E.2d 52, 65 (2000) (rejecting claim of ineffectiveness for counsel's failure to utilize an expert on eyewitness identification); *State v. Carter*, 89 Ohio St.3d 593, 606, 734 N.E.2d 345, 357(2000) (rejecting claim of ineffectiveness for counsel's failure to pursue MRI testing in the penalty phase). There is nothing in the record from which we can determine whether such evidence would have been favorable to Morlock and caused the outcome of the trial to be different. *State v. Coleman,* 45 Ohio St.2d 298, 307-308, 544 N.E.2d 622(1989).

{¶87}  We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997-Ohio-355; State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001), *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). Based upon the entire record in this matter we find Morlock's convictions are not against the manifest weight of the evidence. To the contrary,

the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Morlock's guilt.

{¶88} Upon review of the entire record, weighing the evidence and all reasonable inferences as a thirteenth juror, including considering the credibility of witnesses, we cannot reach the conclusion that the trier of facts lost its way and created a manifest miscarriage of justice. We do not find the jury erred when it found Morlock guilty. The fact that the jury chose to believe the testimony of the state's witnesses, some of which was contradictory, does not, in and of itself, render his convictions against the manifest weight of the evidence. The state presented testimony and evidence from which the jury found all the essential elements of the offenses proven beyond a reasonable doubt.

{¶89} Upon careful consideration of the record in its entirety, we do not find that the jury disregarded or overlooked compelling evidence that weighed against conviction.

{¶90} Morlock's Second Assignment of Error is overruled.

III.

{¶91} In his Third Assignment of Error, Morlock argues he was denied effective assistance of counsel because counsel failed to adequately cross-examine the state's witnesses.

**Standard of Appellate Review**

{¶92} To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687–688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674,

693(1984). A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other. *Strickland* at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699; *State v. Madrigal*, 87 Ohio St.3d 378, 2000-Ohio-448, 721 N.E.2d 52 (2000). *State v. Watson*, 5th Dist. Stark No. 2022CA00145, 2023-Ohio-3137, ¶ 29.

**Issue for Appellate Review**: *Whether there is a reasonable probability that, but for counsel's failure to highlight inconsistencies in the testimony of the state's witnesses through cross-examination, the result of the proceeding would have been different.*

{¶93} The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45; *State v. Campbell*, 90 Ohio St.3d 320, 339, 738 N.E.2d 1178 (2000). In addition, to fairly assess counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶94} However, even assuming arguendo counsel's failure to cross-examine the witnesses concerning inconsistencies reflected deficient performance, Morlock cannot establish prejudice under *Strickland*. We note that in his brief, Morlock cites inconsistencies in the testimony of various state witnesses. Thus, the jury was aware that some of the facts were inconsistent between the state's witnesses. Counsel did highlight in his cross-examination of Jordan that Clayton and Andrew were "the only two people in the car…" 2T. at 118. Counsel may have made a strategic decision to not ask about Morlock choosing to rely instead on the fact that Jordan did not mention Morlock during his direct testimony.

{¶95} In addition, the jury was instructed,

A discrepancy in a witness' testimony or between his or her testimony and that of another, if there are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time. You are all certainly aware of the fact that two persons who are witness to an incident may often see or hear it differently. In considering… a discrepancy in a witness' testimony you should consider whether such testimony concerns an important fact or a trivial one.

3T. at 161. The jury was further instructed that Clayton, Andrew and Jordan's testimony "should be viewed with grave suspicion and weighed with great caution…" because they were said to be accomplices. 3T. at 162.

{¶96} We reject Morlock's arguments concerning discrepancies or inconsistency's in Clayton's testimony for the reasons explained in our disposition of Morlock's First and Second Assignments of Error.

{¶97} Morlock has not shown that there was a reasonable probability that, but for counsel's error, the result of his trial would have been different.

{¶98} Morlock's Third Assignment of Error is overruled.

IV.

{¶99} In his Fourth Assignment of Error, Morlock contends that the trial court erred and abused its discretion by failing to hold a restitution hearing to require the state to prove the restitution amount by a preponderance of the evidence.

{¶100} We review felony sentences, including sentences ordering restitution, using the standard of review set forth in R.C. 2953.08. *State v. Poff,* 5ᵗʰ Dist. Morgan No. 20AP-0005, 2021-Ohio-384, ¶33-34; *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶22; *State v. Howell*, 5th Dist. Stark No. 2015CA00004, 2015-Ohio-4049, ¶31. R.C. 2953.08(G)(2) provides we may either increase, reduce, modify, or vacate a sentence and remand for resentencing where we clearly and convincingly find that either the record does not support the sentencing court's findings under R.C. 2929.13(B) or (D), 2929.14(B)(2)(e) or (C)(4), or 2929.20(I), or the sentence is otherwise contrary to law. *See, also, State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.2d 659, ¶28.

{¶101} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. *See also, In re Adoption of Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613 (1985). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, 161 Ohio St. at 477, 120 N.E.2d 118.

## Restitution

{¶102} Morlock's counsel stated his intention to object to restitution specifically "on the grounds of indigency * * *." Sent. T., Jan. 24, 2023 at 13. When the trial court later ordered restitution in open court, counsel only made a general objection "to the restitution order." Id. at 19.[13] Taken together this would appear to indicate that Morlock objected to

---

[13] Counsel made no objections to restitution during the re-sentencing hearing that took place on Apr. 6, 2023.

the restitution order on the ground that he was indigent and therefore unable to pay, not that he disputed the amount the trial judge order that he pay to Buddy. On appeal, Morlock objects to the amount of restitution, arguing the state failed to prove the amount by a preponderance of the evidence. [Appellant's brief at 24]. We find that Morlock failed to specifically tell the trial judge he was objecting to the amount of restitution or that he was asking for a hearing on the amount of restitution. Accordingly, he has waived all but plain error.

{¶103} Morlock did not raise plain error with respect to restitution during the sentencing hearing in his assignments of error or argument in this Court. Because he does not claim plain error on appeal, we need not consider it. *See, State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 17–20 (appellate court need not consider plain error where appellant fails to timely raise plain-error claim); *State v. Gavin*, 4th Dist. Scioto No. 13CA3592, 2015-Ohio-2996, 2015 WL 4549872, ¶ 25, *citing Wright v. Ohio Dept. of Jobs & Family Servs.,* 9th Dist. Lorain No. 12CA010264, 2013-Ohio-2260, 2013 WL 2407158, ¶ 22 ("when a claim is forfeited on appeal and the appellant does not raise plain error, the appellate court will not create an argument on his behalf"); *State v. McCreary,* 5th Dist. Ashland No. 21-COA-026, 2022-Ohio-2899. ¶65; *State v. Carbaugh*, 5th Dist. Muskingum No. CT2022-0050, 2023-Ohio-1269, ¶67; *State v. Fitts*, 6th Dist. Wood Nos. WD18-092, WD18-093, 2020-Ohio-1154, ¶21; *Simon v. Larreategui*, 2nd Dist. Miami No. 2021-CA-41, 2022-Ohio-1881, ¶41.

{¶104} However, even if Morlock had raised plain error on appeal, he would not prevail.

{¶105} R.C. 2929.18(A)(1) authorizes a trial court to impose restitution as part of a sentence in order to compensate the victim for economic loss. "A trial court has discretion to order restitution in an appropriate case and may base the amount it orders on a *recommendation of the victim*, the offender, a presentence investigation report, *estimates or receipts indicating the cost of repairing or replacing property*, and other information, but the amount ordered cannot be greater than the amount of economic loss suffered as a direct and proximate result of the commission of the offense." *State v. Lalain*, 136 Ohio St.3d 248, 2013-Ohio-3093, 994 N.E.2d 423, paragraph one of the syllabus (emphasis added); R.C. 2929.18(A)(1). A court's order of restitution must be supported by competent, credible evidence. *State v. Warner*, 55 Ohio St.3d 31, 69, 564 N.E.2d 18 (1990).

{¶106} In *Lalain*, the Ohio Supreme Court noted,

> R.C. 2913.02(B)(5) states, "If the property stolen is a motor vehicle, a violation of this section is grand theft of a motor vehicle, a felony of the fourth degree," regardless of the value of the motor vehicle. A trial court choosing to order restitution in a case of grand theft of a motor vehicle is not restricted to the value corresponding to a fourth-degree felony and may instead award restitution pursuant to R.C. 2929.18(A)(1).

136 Ohio St.3d 248, 2013-Ohio-3093, 994 N.E.2d 423, ¶24.

{¶107} "[W]hen a vehicle has been totally destroyed, 'the measure of damages is its reasonable market value immediately before destruction.'" *State v. Moore*, 1st Dist. Hamilton No. C-220421, 2023-Ohio-3318, ¶ 12, *quoting Falter v. Toledo*, 169 Ohio St. 238, 240, 158 N.E.2d 893 (1959). Thus, the economic loss suffered by the victim when a

vehicle has been destroyed is the fair market value of the vehicle prior to the accident. *See* id. at ¶ 12. *See, State v. Mazan*, 1st Dist. Hamilton No. C-2340053, 2023-Ohio-4385, ¶8.

{¶108} The record indicates that the state represented to the trial judge that Buddy estimated his car's value at $3,300.00. Sent. T., Jan 24, 2023 at 9. R.C. 2929.18(A)(1) permits a trial judge to accept the victim's recommendation. Receipts were admitted to show $499.00 to replaced his cell phone and his investment in the automobile's stereo system to be $1,618.22. Id.

{¶109} We find that the trial judge based her order of restitution on the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offenses. Had Morlock asked the trial judge for a hearing on the amount of restitution or otherwise alerted the trial judge that he disputed the amount, we have no doubt that the trial judge would have held a hearing. Morlock's failure to raise the issue precluded the trial judge from preventing or correcting any error.

{¶110} Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. We do not find a manifest miscarriage of justice occurred in this case. Accordingly, we decline to find plain error.

{¶111} Morlock's Fourth Assignment of Error is overruled.

{¶112} The judgment of the Stark County Court of Common Pleas is affirmed.

By Gwin, J.,

Delaney, P.J., and

Wise, J., concur